# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

MOBY S.P.A.,

           Plaintiff,

v.

MORGAN STANLEY, MORGAN
STANLEY & CO. LLC, ANTONELLO
DI MEO, MASSIMO PIAZZI AND
DOV HILLEL DRAZIN,

           Defendants.

Index No.: _____

**SUMMONS**

Plaintiff designates New York
County as the place of trial.

Venue is proper in this County
pursuant to N.Y. C.P.L.R. § 503

TO THE ABOVE-NAMED DEFENDANTS:

      YOU ARE HEREBY SUMMONED and required to serve upon Plaintiff's attorneys an

answer to the Complaint in this action within twenty (20) days after service of this Summons,

exclusive of its day of service, or within thirty (30) days after service is complete if the

Summons is not personally delivered to you within the State of New York. In case of your

failure to appear or answer, judgment will be taken against you on default for the relief

demanded in the Complaint.

      Plaintiff designated New York County as the place of trial. Venue is appropriate in New

York County pursuant to N.Y. C.P.L.R. § 503.

Dated:    October 14, 2021        **QUINN EMANUEL URQUHART & SULLIVAN, LLP**

_/s/ Alain Jaquet_

Juan P. Morillo (_pro hac vice application forthcoming_)
Alain Jaquet
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Email:  juanmorillo@quinnemanuel.com
Email:  alainjaquet@quinnemanuel.com

_Attorneys for Moby S.p.A._

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

MOBY S.P.A.,

                 Plaintiff,

v.

MORGAN STANLEY, MORGAN
STANLEY & CO. LLC, ANTONELLO
DI MEO, MASSIMO PIAZZI AND
DOV HILLEL DRAZIN,

                 Defendants.

Index No. _____

**COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

PARTIES ...............................................................................................................................4

I.     Plaintiff ....................................................................................................................4

II.    Defendants ..............................................................................................................10

JURISDICTION AND VENUE ...........................................................................................13

STATEMENT OF FACTS ...................................................................................................13

I.     Defendants' Active Scheme to Derail the *Concordato*...................................13

     A.    The 2016 Financing and Issuance of the Notes ................................................13

     B.    Defendants' Share of the Notes .........................................................................14

     C.    Defendants' Scheme to Increase Their Share of the Notes in Order to
          Derail Moby's Restructuring ............................................................................17

     D.    Defendants' Unlawful Use of Confidential Information to Further Their
          Scheme ..............................................................................................................19

     E.    Defendants' Scheme to Harm Other Creditors ..................................................24

II.    Defendants' Scheme is Part of a Pattern of Obstruction to Harm Moby...........................27

     A.    Overview............................................................................................................27

     B.    Di Meo's Successful Efforts to Derail the DFDS Deal and Moby's
          Restructuring Plans ...........................................................................................30

          1.    Moby's Business Plan for 2019 to 2021 .................................................30

          2.    The DFDS Deal........................................................................................31

          3.    The Sham Involuntary Petition ...............................................................32

          4.    The Attack on the DFDS Deal .................................................................33

     C.    Triggering of a Liquidity Crisis in Late 2019 and Other Significant Harm .........35

     D.    Active Interference in Moby's Restructuring Efforts Between 2019 and
          2021....................................................................................................................36

III.    Defendants' Scheme to Seize Control of Moby Accelerates...............................................38

CAUSES OF ACTION...........................................................................................................43

Case 1:22-cv-01300  Document 1-1  Filed 02/15/22  Page 6 of 57

## INTRODUCTION

1.      This is a case about an Italian vulture investor, Antonello Di Meo ("Di Meo"), and Morgan Stanley and its subsidiaries (together, "Morgan Stanley") attempting to illegally acquire control of Moby S.p.A. ("Moby" or "Company"), one the world's largest passenger shipping companies based in Italy.  They are doing so by trying to unlawfully purchase a sufficient quantum of Moby's bonds at a substantial discount using inside information so that they can assume control of, liquidate and dismember the Company.

2.      Moby brings this action in New York because Morgan Stanley is based here, Defendants orchestrated and are attempting to execute their illegal scheme from New York and Moby's bonds are governed by New York law.

3.      Moby is owned by the Onorato family, which has been in the shipping industry for over 140 years and five generations.  Moby itself is nearly 40 years old and employs approximately 6,000 people whose jobs will disappear if Moby is liquidated.

4.      Moby is in a restructuring proceeding (a type of pre-bankruptcy proceeding) before the Civil Bankruptcy Section of the Court of Milan, Italy ("Milan Tribunal").  It has reached an agreement with a substantial number of its bondholders on a restructuring plan and is now seeking additional creditor approval to reach an agreement with its creditors and avoid liquidation.

5.      Defendants are minority bondholders and have received confidential insider information regarding Moby in connection with its ongoing restructuring, including proprietary information concerning Moby's finances and operations.  Specifically, Di Meo received such information since early 2020 (at the latest), including when he signed a non-disclosure agreement ("NDA") in which he promised that he would keep the information confidential and acknowledged that Moby's information is protected by Italian and European Union ("EU")

market abuse laws. Nevertheless, Defendants are using that material, non-public information to acquire additional bonds in their attempts to take control of Moby.

6. If successful, Defendants' scheme would not only allow them to take control of Moby, but also to unlawfully minimize or eliminate the return for other creditors (among them U.S. parties), including bondholders with whom Moby has undertaken laborious negotiations in good faith and with which it reached a restructuring agreement. By contrast, Moby's restructuring proposal is aimed at maximizing returns for all creditors while also preserving the livelihoods of thousands of people in Europe and ensuring the continued provision of critical transportation services in the Mediterranean.

7. That Defendants are acting with malicious intent – to cripple the restructuring and thereafter dismantle the Company, eliminating thousands of jobs in the process – is further underscored by the fact that Moby is currently operating successfully. For instance, in summer 2021, Moby had a successful season, with revenues exceeding expectations. It makes no legitimate sense for creditors (such as Defendants here) to take actions aimed at destroying the Company, especially when it is just months away from emerging from its restructuring proceeding. Rather, Defendants are doing so for their selfish, illegitimate interest and at the expense of Moby's employees and other creditors.

8. This is the latest in a line of improper tactics Di Meo has deployed to acquire Moby. In 2019, Di Meo orchestrated the filing of a fraudulent involuntary bankruptcy petition ("Involuntary Petition"), which the Milan Tribunal summarily dismissed as having been inappropriately filed because Moby was not insolvent. The Involuntary Petition, however, caused Moby significant economic and reputational harm, including making it substantially more difficult and expensive for Moby to refinance its debt.

9.      Also in 2019, Di Meo thwarted Moby's attempt to refinance its debt through a transaction with DFDS A/S ("DFDS"), a Danish shipping company, that involved the sale and purchase of various vessels ("DFDS Deal").  Di Meo did so by unlawfully making it impossible for Moby to meet a key requirement of the transaction: ensuring that the vessels were free of mortgages.  As a result of Di Meo's intentional and unlawful scuttling of the DFDS Deal, Moby was forced to enter into restructuring proceedings in June 2020.

10.     Faced with these repeated acts of economic piracy, Moby, through counsel, retained an investigative firm to uncover Di Meo's disguised plot and to discover whether Di Meo planned additional schemes to acquire control of a dominant stake in Moby's bonds and, as a result, Moby.  This investigation yielded recordings of conversations by Di Meo and Morgan Stanley that directly corroborate the core allegations in this Complaint.  These conversations are set forth herein.

11.     Among the key revelations of the investigation is that Morgan Stanley is participating in the unlawful scheme by intentionally concealing the fact that it holds, for its own benefit, at least 10% of the bonds.  It is doing so despite being a market maker, which typically involves entities providing liquidity to investors by standing ready to neutrally buy or sell bonds at any time and not favoring one investor over another, much less – as Morgan Stanley is doing here – partnering with one investor and capitalizing on confidential, insider information to the detriment of other investors.  Indeed, to ensure its position remains undetected (notably, from other bondholders), Morgan Stanley is using Di Meo as a straw person to control its stake in the bonds.

12.     Moby plans to file for recognition of its Italian bankruptcy proceedings in the United States under chapter 15 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* ("Chapter 15").

Chapter 15 allows a foreign company, such as Moby, to enforce a foreign bankruptcy court's orders against parties subject to jurisdiction in the United States. A Chapter 15 proceeding can include a stay against any effort to execute against a foreign debtor's (Moby's) assets by any creditor within the jurisdiction of the United States (Morgan Stanley).

13.     Moby is in the process of obtaining final approval in Italy to file for Chapter 15, which it anticipates will be forthcoming shortly. In Chapter 15 proceedings, Moby will seek an automatic stay order and an order to cease trading in its bonds to stop Defendants' continuing efforts to illegally disrupt the restructuring and thwart the hard-fought understandings that Moby has with its creditors.

## PARTIES

### I.     PLAINTIFF

#### A.     History, Operations and Corporate Structure

14.     Moby is a privately owned, leading Italian shipping company headed by the Onorato family. It was founded in 1982 by Vincenzo Onorato, whose family has played a leading role in the Italian shipping industry for five generations and over 140 years.

15.     Moby has multiple business lines and subsidiaries (together, "Moby Group"). The Moby Group's principal business is the transport of passengers and freight between mainland Italy and France and various islands in the Mediterranean Sea, including Sicily, Sardinia and Corsica. In 2017, the Moby Group expanded its ferry business to the Baltic Sea, where it launched cruises that have ports of call in Russia (St. Petersburg), Estonia (Tallinn), Sweden (Stockholm) and Finland (Helsinki).

16.     The Moby Group also has a tugboat business, providing rescue services in the aftermath of shipping accidents at sea. In addition, it provides other limited port services (e.g., passenger ticketing) in several Italian cities, such as Livorno on the coast of Tuscany.

4

17.     The Moby Group's fleet is one of the most modern and largest in Europe and, worldwide, it is the largest in terms of passenger, bed and vehicle capacity.  The fleet is currently composed of several dozen ferries and tugboats and, prior to the COVID-19 pandemic, had a market value of approximately €1 billion.

18.     The Moby Group collectively has approximately 6,000 employees – based primarily in southern Europe – with the majority of its businesses and operations executed by Moby and its main subsidiary, Compagnia Italiana di Navigazione S.p.A. ("CIN").

19.     In 2011, Moby, together with other investors, created CIN to acquire the maritime transportation business unit of Tirrenia di Navigazione S.p.A. ("Tirrenia"), an Italian state-owned company ("Tirrenia Acquisition").  This acquired unit included vessels and shipping lines connecting mainland Italy with Sardinia and Sicily.  In 2015, Moby – which then held a 40% ownership stake in CIN – acquired the shares of the other investors, which resulted in Moby becoming CIN's sole shareholder.

20.     The Italian government deems Moby to be systemically important to the national transportation and maritime industry.  In view of the absence of bridges connecting mainland Italy to Sicily or Sardinia, Moby's passenger and freight services provide critical infrastructure to Italian citizens and businesses.  Given its importance, the Italian national and regional governments provide the Moby Group with subsidies totaling several million Euros per year to operate certain routes considered to be in the public interest throughout the year and, in particular, during the low season.  The low season spans from October to March, when there are fewer tourists using the ferries than in the spring and summer.

21.     The Moby Group is fully owned by Onorato Armatori S.r.l. ("Onorato Holding"), an Italian limited liability company owned by Vincenzo Onorato.  Moby's registered office is

located at Via Larga 26, 20122 Milan, Italy, while its administrative headquarters are located at Viale Teseo Tesei, 57037 Portoferraio, Italy.

### B.    The *Concordato* Proceeding

22.    Moby is currently subject to a "*concordato*," or restructuring, proceeding before the Milan Tribunal. The objective of the *concordato* is for Moby to reach an agreement with its creditors regarding its outstanding debts and enable it to avoid being placed into liquidation by the Milan Tribunal. Under Italian law, a company declared bankrupt would have its management replaced and, ultimately, forced into piecemeal liquidation.

23.    On June 30, 2020, Moby filed a preliminary petition for a court-supervised restructuring where current management remains in control ("Preliminary Petition").

24.    On July 9, 2020, the Milan Tribunal entered an order commencing the *concordato* stating that, by October 28, 2020, Moby was entitled to file (i) a proposal for the repayment of its debts, together with a plan detailing how such debts would be restructured or discharged ("Concordato Proposal" and "Concordato Plan," respectively); or (ii) a private debt restructuring agreement with creditors representing at least 60% of the overall debt ("Debt Restructuring Agreement").

25.    Moby requested, and the Milan Tribunal granted, an extension of the deadline for filing either a Concordato Proposal or Debt Restructuring Agreement by five months – to March 29, 2021. Moby sought the extension to allow for ongoing negotiations with its creditors. Di Meo participated in numerous discussions relating to the Concordato Proposal.

26.    On March 29, 2021, Moby filed a full petition for admission to the *concordato* that included the submission of a Concordato Proposal and Concordato Plan ("Full Petition"). In May and June 2021, Moby filed amended Concordato Plans with the Milan Tribunal. Also in May 2021, CIN filed a full petition with the Milan Tribunal for admission to the *concordato*.

6

Case 1:22-cv-01300   Document 1-1   Filed 02/15/22   Page 12 of 57

27.     On June 24, 2021 – after Moby filed its second amended Concordato Plan – the Milan Tribunal formally opened the *concordato* procedure for both Moby and CIN and, for each procedure, appointed three judicial commissioners ("Commissioners").   The role of the Commissioners is to supervise current management during the *concordato*.  The Milan Tribunal also set the creditors' meetings to vote on the respective restructuring proposals and plans of Moby and CIN.  The creditors' meeting for Moby's Concordato Proposal and Concordato Plan is currently scheduled for December 13, 2021 while that for CIN is currently scheduled for December 20, 2021.

28.     At the forthcoming meeting of Moby's creditors ("December 13 Meeting"), the creditors will vote on Moby's restructuring proposal, which must be approved by the majority (by value of claims) of the creditors entitled to vote.  If the creditors do not approve Moby's Concordato Proposal and Concordato Plan, the Milan Tribunal may declare the Company bankrupt and subject to liquidation.  In such a scenario, Moby management would be replaced and the Company ultimately liquidated.

29.     Creditors may also independently request that the Milan Tribunal declare Moby bankrupt and force a liquidation.  Creditors often seek liquidation to acquire assets below market value or to eliminate a competitor.

30.     On September 21, 2021 and following months of negotiations, Moby – together with CIN and Onorato Holding – entered into a non-binding memorandum of understanding ("MOU") with an *ad hoc* group of bondholders ("Ad Hoc Group 1") that holds more than 33% of the outstanding principal of the bonds.  Pursuant to the MOU, the Moby Group and Ad Hoc Group 1 will continue negotiations with the objective of, among other things, obtaining

7

additional financing in support of a restructuring plan to submit to Moby Group creditors.[1]  If consummated, the agreement will allow for Moby to continue its operations and preserve jobs supporting thousands of people.

31.     The Moby Group and Ad Hoc Group 1 are currently working closely to facilitate a successful restructuring and, for avoidance of doubt, none of the allegations or claims set forth in this Complaint are against any member of Ad Hoc Group 1.

### C.     Chapter 15 Proceeding in the United States

32.     Moby intends to shortly file a petition with a U.S. Bankruptcy Court to seek protection under Chapter 15.  In 2005, Congress enacted Chapter 15 to promote and facilitate, among other things, (i) a fair and efficient administration of international insolvency proceedings, including those involving an insolvent non-U.S. debtor that owns property and/or has creditors in and outside the United States (such as Moby); (ii) the protection and maximization of the value of the debtor's assets; and (iii) the rescue of the debtor in order to preserve employment.

33.     Moby is eligible for Chapter 15 protection because it has property in the United States, including its contract rights under the indenture governing the bonds ("Indenture").  The Indenture designates New York law as the governing law, and the parties irrevocably consented to Manhattan as the venue of any proceeding arising under the bonds.

34.     Chapter 15 protection affords Moby (i) the ability to implement and enforce, in the United States, current and future orders issued by the Milan Tribunal, including one that would confirm creditors' approval of the Concordato Proposal and Plan; and (ii) upon the U.S.

---

[1]     The parties to the MOU agreed that the terms of the MOU are strictly confidential and cannot be disclosed unless obligated by law, required by an order of a competent court or authority, or with the prior written consent of the other Parties.

Case 1:22-cv-01300   Document 1-1   Filed 02/15/22   Page 14 of 57

Bankruptcy Court's recognition of the *concordato*, relief in the form of orders that would preclude creditors – including those aiming to obstruct Moby's restructuring efforts in Italy, such as Defendants – from interfering with Moby's assets (the Indenture and MOU) in the United States.

35.     In addition, Chapter 15 provides for preliminary relief, such as a stay to protect Moby's assets and contract rights in the United States from its creditors. Provisional relief under Chapter 15 includes an order restricting trading in Moby's bonds to further protect Moby's contract rights (the Indenture and MOU) and the *concordato* proceeding itself.

36.     Moby has been preparing to file for Chapter 15 protection for the past several months and is awaiting final approval from the Commissioners to initiate the procedure.

### D.     Third-Party Investigation Firm

37.     In April 2021, Moby – through external counsel – retained a global third-party investigative services firm ("Investigative Firm") that specializes in, among other things, complex fraud cases to conduct an investigation ("Investigation").

38.     Moby did so given the egregious and sustained attacks that it had endured for close to two years – levied against it primarily by Di Meo. In particular, Moby determined that it needed to defend itself and undertake steps to root out precisely how and why Di Meo was waging this aggressive, orchestrated and unlawful campaign.

39.     As set forth in this Complaint, the result of the Investigative Firm's work confirmed what Moby had long assumed: Di Meo has waged a multi-year campaign to intentionally harm, batter and, ultimately, assume control over Moby. Among other things, the Investigation revealed Di Meo's central role in the filing of the Involuntary Petition in September 2019 and derailing of the DFDS Deal in October 2019 – both of which led to a precipitous decline in Moby's liquidity and ultimately forced it into restructuring.

9

40. The Investigation resulted in recorded statements by Di Meo and Dov Hillel Drazin ("Drazin") during which they repeatedly acknowledged their role in the scheme to unlawfully cripple and seize Moby. Unless otherwise indicated, the quoted statements contained in this Complaint were obtained by the Investigative Firm in telephone or videoconferences with Di Meo and Drazin.

## II. DEFENDANTS

### A. Morgan Stanley

41. Morgan Stanley is a Delaware corporation with its principal place of business in New York. Its headquarters are located at 1585 Broadway, New York, NY 10036.

42. Morgan Stanley, regulated by the Board of Governors of the Federal Reserve, is a global financial services firm that employs over 55,000 persons. Its direct and indirect subsidiaries include Morgan Stanley & Co. LLC ("MS&Co.") and Morgan Stanley & Co. International plc ("MS&Co. International"). Unless otherwise specified, any references herein to Morgan Stanley are to this global parent holding company and its subsidiaries or affiliates.

### B. Morgan Stanley & Co. LLC

43. MS&Co. is an investment management company incorporated in Delaware with its principal place of business in New York. Its address is 1585 Broadway, New York, NY 10036. MS&Co. is a wholly owned subsidiary of Morgan Stanley Domestic Holdings, Inc., which is a subsidiary of Morgan Stanley.

44. MS&Co. is registered with the U.S. Securities and Exchange Commission as an institutional securities broker-dealer and is a member of the Financial Industry Regulatory Authority ("FINRA") and other securities exchanges.

Case 1:22-cv-01300  Document 1-1  Filed 02/15/22  Page 16 of 57

### C.  Antonello Di Meo

45.  Di Meo is an Italian citizen who resides, upon information and belief, in Italy, Greece and the United Arab Emirates.

46.  From, at the latest, September 2014 to in or around June 2020, Di Meo was an employee of Sound Point Capital Management UK, LLP ("Sound Point UK"), the UK affiliate of New York-based hedge fund Sound Point Capital Management, LP (together with Sound Point UK and any other Sound Point entities and affiliates, "Sound Point").  Until at least early February 2021, Di Meo continued to use a Sound Point email address with the following domain: "@soundpointcap.com."

47.  In or around June 2020, Di Meo left Sound Point and, upon information and belief, joined Mangart Capital Advisors SA, an asset management firm incorporated in and with its principal place of business in Lugano, Switzerland, as a portfolio manager.  As of the date of this Complaint, Di Meo is self-employed with his own investment company.

48.  Before joining Sound Point, Di Meo was employed in London by affiliates of a U.S. bank and a New York-based hedge fund, as well as Barclays plc ("Barclays"), the British financial conglomerate.  During his tenure at Barclays, Di Meo worked together with Drazin.

### D.  Massimo Piazzi

49.  Massimo Piazzi ("Piazzi") is an Italian and UK citizen who currently resides, upon information and belief, in the United Kingdom.  Upon information and belief, Piazzi resided in New York until in or around May 2021.

50.  Piazzi has worked at Morgan Stanley since 2009, at the latest, when he was appointed by the firm as a Managing Director.  Most recently, since in or around June 2021, Piazzi has been working for MS&Co. International, which is a subsidiary of Morgan Stanley International Limited, an intermediate parent company.  Between in or around June 2019 and

11

May 2021, Piazzi served as a Managing Director at MS&Co., leading its distressed debt business at a global level.  Since August 2019, Piazzi has been a FINRA-registered broker with MS&Co.

51.    Upon information and belief, from 2012 to 2020, Piazzi was a Vice President of Morgan Stanley Strategic Investments, Inc. ("MSSI"), an investment company incorporated in Delaware and with its principal place of business in New York.  MSSI's address is 1585 Broadway, New York, NY 10036.

52.    Upon information and belief, from approximately 2010 to September 2019, Piazzi was also a Director at Morgan Stanley Humboldt Investments Limited ("MSHIL"), a London-based investment firm that is part of Morgan Stanley.

### E.    Dov Hillel Drazin

53.    Drazin is a Canadian citizen who resides, upon information and belief, in the United Kingdom.

54.    Since in or around May 2019, Drazin has worked for MS&Co. International.  At Morgan Stanley, Drazin serves as a Managing Director and the Head of the Special Situations Group for Europe, the Middle East and Africa.  His responsibilities in this position include, among others, trading distressed assets.  Since 2019, Drazin has also been a Director of MSHIL.

55.    Before joining Morgan Stanley, Drazin worked at other international financial institutions, including (i) TPG Special Situations Partners, the U.S.-based investment firm, where he served as Managing Director; (ii) Barclays, where he served as Managing Director and Head of Distressed Trading, Origination and Research and worked, for a certain period, with Di Meo; and (iii) Lehman Brothers, where he served as Managing Director of Distressed Sales and also worked in the Municipal Bond Division.

12

## JURISDICTION AND VENUE

56.    This Court has jurisdiction over this action pursuant to N.Y. C.P.L.R. §§ 301 and 302.

57.    This Court has personal jurisdiction over Morgan Stanley and MS&Co. because their principal place of business is in New York.

58.    This Court has personal jurisdiction over Di Meo, Piazzi and Drazin because, together with Morgan Stanley, they orchestrated a scheme to unlawfully take over Moby – a scheme that they knew was carried out in substantial part from New York.

59.    This Court has personal jurisdiction over all Defendants because they are part of an unlawful coordinated scheme to seize Moby that was and is being carried out in substantial part from New York.  This Court has personal jurisdiction over each Defendant because (i) each has or had agents or co-conspirators in New York, transacted business in New York or violated a right in New York; and (ii) a substantial part of the events giving rise to Plaintiff's claims arose in New York.

## STATEMENT OF FACTS

I.    **DEFENDANTS' ACTIVE SCHEME TO DERAIL THE *CONCORDATO***

A.    **The 2016 Financing and Issuance of the Notes**

60.    In February 2016 and to primarily extinguish debt totaling approximately €429.2 million, Moby obtained €260 million in financing from a consortium of eight U.S. and non-U.S. banks ("Lenders") and issued €300 million in senior secured bonds (also referred to herein as the "Notes").  The Lender-issued financing comprised (i) a €200 million loan to be repaid in annual installments through 2021 ("Term Loan"); and (ii) a €60 million revolving credit facility, offered from five of the Lenders, to be fully repaid by 2021 ("Revolving Facility").

13

Case 1:22-cv-01300    Document 1-1    Filed 02/15/22    Page 19 of 57

61.    Moby issued the Notes in accordance with the Indenture, which is the agreement detailing the terms of the securities issuance.  Section 13.07 of the Indenture provides that both it and the Notes are subject to New York law.  The Indenture also states, among other things, that the (i) Notes were issued by Onorato Armatori S.p.A. (i.e., Moby's predecessor), are traded on the Luxembourg Stock Exchange, and accrue interest of 7.75% per year that is payable in two semi-annual payments in February and August; and (ii) Notes' principal is due on February 15, 2023.

62.    The 2016 financing was governed by two other agreements (together with the Indenture, "Debt Agreements"), as follows: (i) a credit facilities agreement, dated February 1, 2016 and which governs the Term Loan and Revolving Facility ("Credit Facilities Agreement"); and (ii) an intercreditor agreement, dated February 11, 2016 and which governs the relationship between Moby's creditors under the Credit Facilities Agreement and the Notes ("Intercreditor Agreement").

63.    The Debt Agreements state that both the financing from the Lenders and the Notes are secured by several collateral, including (i) mortgages over vessels, whose market value was estimated at approximately €900 million and which belonged to Moby and CIN; and (ii) pledges over Moby and CIN's shares and certain of their bank accounts (together, "Collateral").

64.    In accordance with the Credit Facilities Agreement, Moby repaid the amounts due on the Term Loan on (i) February 12, 2017; (ii) February 12, 2018; and (iii) February 11, 2019.

**B.    Defendants' Share of the Notes**

65.    Upon information and belief, Di Meo holds Notes valued at approximately €50 million, while Morgan Stanley holds Notes valued at approximately €29 million. Defendants therefore collectively hold at least 26% of all the Notes:  €79 million out of a total

14

€300 million. In a recorded conversation with the Investigative Firm on August 9, 2021, Di Meo stated the following:

> So, 50 million, and I'll be 100% transparent with you, I hope that, again, you treat the information with confidentiality, and I don't want to even see in emails or anything else. *50 million is directly controlled by my investment company. 29 million is controlled by Morgan Stanley.* (Emphasis added.)

66. Defendants have coordinated their acquisition of the Notes. In recorded conversations with the Investigative Firm on June 3 and August 22, 2021, Di Meo described his relationship with Morgan Stanley as "trustworthy" and stated that a "consortium" existed between his company and Morgan Stanley.

> My trader, trusted friend is at Morgan Stanley. I know the global head of the business, he's Italian, he's my brother. *We've been buying these 80 million [in Notes] together.* (June 3, 2021; emphasis added.)

> I have my own investment company, I manage family office money. I worked in London for 20 years in JP Morgan, TPG Capital, Barclays, and Sound Point Capital. *I used to work with [Defendant] Hillel Drazin at Barclays for a few years, so we know each other very well and there is a very trustworthy relationship . . . Hillel also works at Morgan Stanley with one of my best friends, Massimo Piazzi, who is an Italian national, like me, who runs globally the distressed business of Morgan Stanley . . . So, there is a consortium basically between my investment company and Morgan Stanley*, which has acquired a significant portion of the bonds of Moby, Moby-CIN . . . . (August 22, 2021; emphasis added.)

67. Upon information and belief, following his departure from Sound Point in or around June 2020, Di Meo began acquiring Notes by using personal funds and those of his investment company. During Di Meo's tenure at Sound Point and through around mid-2020, Sound Point also held a stake in the Notes. In or around Summer 2020, Sound Point sold its share, at about the time that Di Meo left the firm.

68. Notwithstanding that it holds an approximate 10% share in the Notes, Morgan Stanley has taken concerted steps to conceal that it holds <u>any</u> position – including because of its

Case 1:22-cv-01300   Document 1-1   Filed 02/15/22   Page 21 of 57

role as a market maker.  Entities holding such a role typically provide liquidity to investors by standing ready to neutrally buy or sell bonds at any time and not favoring one investor over another, much less partnering with one investor to the detriment of other investors.  Indeed, Morgan Stanley has gone so far as obtaining a notarized statement from a public notary in London attesting that *Di Meo* collectively holds 26% of the Notes.  In effect, Morgan Stanley is using Di Meo as a frontperson to conceal its position.

69.     In recorded conversations with the Investigative Firm on August 9, 16 and 22, 2021, Di Meo described these efforts to conceal Morgan Stanley's position in the Notes:

> As you might understand . . . *Morgan Stanley cannot formally enter into agreement because they are a market maker* . . . Now you need to understand the sensitivity around Morgan Stanley, which is the following.  *First, they are a market maker, they cannot be seen by hedge fund clients as siding with one.  So, they cannot enter formally into agreements with me or with anybody else because they are a market-making desk* . . . .  (August 9, 2021; emphasis added.)

> I had Morgan Stanley send an email to a notary public in London saying that I effectively manage their position, and that's why I have this notary public statement . . . by Savills London that says, "Antonello Di Meo controls 26% of the bonds."  *So, the notary public wrote this statement, this sworn statement on the basis of an email that Morgan Stanley sent to represent that I have the management of their position*.  (August 9, 2021; emphasis added.)

> . . . [B]ecause again, Morgan Stanley, you have to understand the sensitivity around it.  *Because it's public on the name, because they need to be able to trade*.  So, if I ask a trader of Morgan Stanley to be part of a meeting with people he doesn't know, and therefore he cannot trust, to participate into a conversation where I will be disclosing what can be considered material, non-public, price-sensitive information, he might get a bit nervous.  (August 16, 2021; emphasis added.)

> So, it's very important to always do things with the view that it becomes public, and is there a problem with people and so on.  *So, also that's why my . . . I'm being very thoughtful and careful when it comes to the involvement of Morgan Stanley because they cannot, at this point in time, publicly say, "We are supporting him."  They are saying that privately to a notary public in London that is preparing a notarized statement that says that those bonds . . . let me show you the statement in the next few days . . . that says that those bonds 100% are given to my control.  But again, they cannot do it in public because it will create issues*

16

Case 1:22-cv-01300   Document 1-1   Filed 02/15/22   Page 22 of 57

*from a trading perspective, they will need to be restricted, and if they're restricted, they cannot buy bonds on the portfolio.* (August 16, 2021; emphasis added.)

### C. Defendants' Scheme to Increase Their Share of the Notes in Order to Derail Moby's Restructuring

70.     As of the date of this Complaint, Defendants are thus among Moby's largest creditors and have a vote in whether to approve or reject the Concordato Proposal and Concordato Plan at the December 13 Meeting.  In recorded conversations with the Investigative Firm on May 26, August 9 and August 16, 2021, Di Meo represented that Morgan Stanley will agree with whatever he decides in connection with Moby's restructuring:

> Obviously, when it comes to the trading business of Barclays, well-connected, but I'm well-connected to most of the distressed debt trading businesses of investment banks.  *One of my best friends who runs the global business of Morgan Stanley*, I'm very well-connected with Stifel, which is the independent broker that trades in Europe and in the U.S., distressed loans and bonds.  (May 26, 2021; emphasis added.)

> The guy who runs Morgan Stanley Global, Massimo Piazzi, is my best friend . . . He's the head of global distressed debt business of Morgan Stanley . . . *He will vote what I say him to vote.*  (August 9, 2021; emphasis added.)

> So, let me have a word with the trader who is ultimately in charge with the position, and reports into my friend, Massimo Piazzi, who's the Global Head . . . The trader is an American-Jewish guy, he's very commercial.  He understands things very quickly.  But his attitude is, "I support Antonello because there will be a good trade."  So, I can answer 100% of the questions of anybody in this deal, I, even myself, I don't disclose 70% of the things to the trader, *because the trader just needs to vote the bonds in the way I tell him to* . . . Now, I can have a word with him and we can try, in order to speed things up, to do everything in one go, but maybe just with a video call with me, the board could be understanding of all the difficult questions to be answered, and I'm sure I can get them comfortable. You said, if they want the last mile with the Morgan Stanley trader, I don't know what kind of value added the call, he can bring, other than saying, "*This is my name, I work for Morgan Stanley and I support Antonello Di Meo with our boards, in the negotiation with the company, but I can only tell you that offline because on the record, I cannot state such things.*"  (August 16, 2021; emphasis added.)

17

71.     In particular, Di Meo's plan – agreed with and facilitated by Morgan Stanley – is to increase Defendants' collective 26% stake in the Notes (as of August 2021) in order to have a dominant voting stake among Moby's creditors in connection with the *concordato* proceeding.

72.     With such dominant voting power in hand, Defendants can singlehandedly direct the future of the proceeding and, in turn, Moby's existence.   Defendants can do so by (i) rejecting Moby's Concordato Proposal and Plan (the acceptance of which requires the majority of creditors' votes) and, as permissible under Italian law, request that the Milan Tribunal put Moby into liquidation given the failed approval; or (ii) presenting a competing restructuring plan that, among other things, is contingent upon the removal of existing management and the installation of handpicked successors.   Under either scenario, Defendants can unilaterally use their voting power to drive a storied company out of existence and impose Defendants' will on the other creditors.

73.     In recorded conversations with the Investigative Firm between early June and late August 2021, Di Meo clearly described his intentions – and this above scheme – as follows:

> So, on 80 million out of 300. You need to get to– so, *I can stop any other bondholders-driven plans, I would need to have 50% of the bonds to force my plan onto others*.  (June 3, 2021; emphasis added.)

> So, you don't need to have 51% of the bond, you don't need to get to 150 million because in the second bondholders' meeting, you just need to have one third of quorum to have the meeting, and then the majority of that. *So, under my calculation, once [another . . . ] hedge fund is bought out, then we control for sure the bondholders' meeting*.  Once you control for sure the bondholders' meeting, you control the vote for 300 million of bond in one class, and that controls the vote of the creditors of Moby because there is less . . . simple majority.  (July 29, 2021; emphasis added.)

> So, that's the idea. That's the whole idea, it's . . . again, my plan is, *I need to buy . . . and make sure that I have 100% of control of the restructuring plan, which means I put forward a plan and I vote, and nobody can block me, that's 100% controlled*.  (August 9, 2021; emphasis added.)

18

Case 1:22-cv-01300 Document 1-1 Filed 02/15/22 Page 24 of 57

I mean, *from bondholders, banks, and other creditors, it's very simple. I don't need them on board if I control the vote.*  (August 9, 2021; emphasis added)

The competing proposal will involve a partial swap of the bonds into equity, to take control, majority or relative majority, to be seen, of the company.  *Ultimately, I want to be in a position where only our vote is enough to pass with the majority the competing plan that I will put forward, and that's why we want to buy certain bonds, to make sure that we can sell, vote such proposal.  Our proposal.*  (August 16, 2021; emphasis added.)

In order to be 100% sure about the voting of the alternative plan, there is a small *additional investment that we are contemplating in making in the bonds to secure mathematical certainty of voting the alternative plan through.  Once we secure this alternative small investment in the bonds, to have the mathematical certainty to have our plan approved, we can effectively put forward any plan that we like, and vote it ourselves without relying upon other creditors' vote.*  (August 22, 2021; emphasis added.)

When it comes to putting forward an alternative plan, the alternative plan will provide . . . for a sale of the two vessels immediately to the entity that we'll indicate, given that you have an interest in these two specific vessels.  *And at the same time, the plan, the alternative plan, will provide for a change in ownership, total or partial, of the current shareholdings.  So, we as creditors will take over the relative majority of the equity in the restructured business* . . . So, the structure would allow for you to secure . . . the immediate acquisition of those two vessels, and at the same time, through your purchased bonds, *which will be converted into partial equity, you will also have an equity interest in the restructured business of Moby, which will change governance* . . . That's overall the big picture.  (August 22, 2021; emphasis added.)

And my plan, *supported also by the backing of Morgan Stanley*, is to put forward an alternative competing restructuring plan which provides for a change in governance in the company.  (August 22, 2021; emphasis added.)

## D.  Defendants' Unlawful Use of Confidential Information to Further Their Scheme

74.  Di Meo, together with his co-Defendants, formed and implemented their plan of building a position in the Notes by unlawfully using confidential insider information relating to Moby's restructuring.  The disclosure and use of such information is prohibited under NDAs that Di Meo and Sound Point executed in 2020 and 2021, as well as under Italian and EU laws.

19

75.     Specifically, in connection with ongoing discussions among Moby and various investors (including Sound Point and other bondholders) relating to the restructuring, Sound Point executed an NDA, dated February 7, 2020 and valid for one year ("Sound Point NDA"), and Di Meo executed another NDA, dated February 11, 2021, which was also valid for one year ("Di Meo NDA").  Di Meo was contractually bound by both NDAs because, when he was still with Sound Point (until in or around June 2020), he was the party actively involved on behalf of the firm in Moby's restructuring.

76.     Under the NDAs, Moby agreed to disclose to selected bondholders, including Sound Point and Di Meo, confidential insider information relating to the Company and its subsidiaries for the sole purpose of facilitating the conclusion of a restructuring agreement.  In general, this confidential insider information included that pertaining to the Moby Group's business, properties, assets, liabilities and operations, among other things. Moby disclosed such information throughout the restructuring negotiations, including, for example, (i) in early 2020, when the Company set up a data room to share extensive financial information and documents with Ad Hoc Group 2;[2] (ii) in July 2020, when Moby provided Ad Hoc Group 2 with other information relating to its financial situation and a third-party assessment on the value of its fleet; and (iii) between December 2020 and January 2021, when Moby provided a copy of its 2021-2015 business plan to Ad Hoc Group 2.

77.     In exchange for receiving confidential, insider information, Sound Point and Di Meo, in turn, agreed to comply with the terms of the NDAs, which specifically restricted them from (i) disclosing confidential information obtained from Moby; and (ii) using such

---

[2]     The information and documents requested by Ad Hoc Group 2 related to, among other things, the Moby Group's short-term liquidity, operational performance, plans to dispose vessels and financial situation (e.g., profit and loss data).

Case 1:22-cv-01300   Document 1-1   Filed 02/15/22   Page 26 of 57

confidential information for purposes other than the negotiation and implementation of a restructuring agreement with Moby.

78.     Furthermore, pursuant to the NDAs, Sound Point and Di Meo (i) acknowledged that confidential information shared by Moby included insider information protected by Regulation EU no. 596/2014 and Italy's Legislative Decree no. 58/1998 (collectively, "Market Abuse Laws"); and (ii) agreed that trading of the Notes would be restricted if it violated Market Abuse Laws.  In addition, according to the NDAs, Sound Point and Di Meo agreed to be restricted from entering into any discussion or agreement relating to the Notes with other Moby creditors if that would contravene the Market Abuse Laws.

79.     Notwithstanding these obligations and the clear and unequivocal prohibitions by which he should have abided, upon information and belief, Di Meo has been trading the Notes and conspiring with Morgan Stanley, including Piazzi and Drazin, from the time he left Sound Point in or around June 2020 to the present.

80.     Di Meo has done so by, upon information and belief, disclosing confidential inside information to third parties (including Piazzi and Drazin), recommending to these parties that they buy Notes, and leveraging such information to help effectuate his scheme.  This is because, in order to determine when, from whom and how many Notes Defendants must acquire to obtain a dominant voting stake, Di Meo necessarily must leverage information concerning, among other things, (i) the status of Moby's negotiations with other creditors and the components of restructuring proposals; and (ii) whether and which bondholders may be willing to sell their Notes and/or be amenable to his competing proposals.  During a recorded conversation with the Investigation Firm on August 16, 2021, Di Meo made clear that he has and would continue to disclose inside information to Morgan Stanley:

We can definitely top up that amount, if needed, between Morgan Stanley and I. So, in terms of– so, if you agree, it's better if you give me a list of questions on email about what the board will ask me.  I think it's easier if we do it in two steps: the first one is the board meeting with myself, then– because again, Morgan Stanley, you have to understand the sensitivity around it.  Because it's public on the name, because they need to be able to trade.  So, if I ask a trader of Morgan Stanley to be part of a meeting with people he doesn't know, and therefore he cannot trust, *to participate into a conversation where I will be disclosing what can be considered material, non-public, price-sensitive information,* he might get a bit nervous. So, let me have a word with the trader who is ultimately in charge with the position, and reports into my friend, Massimo Piazzi, who's the Global Head (Emphasis added.)

81.     Upon information and belief and through the date of this Complaint, Di Meo continues to access and exploit inside information pertaining to Moby.  In furtherance of their scheme, Defendants continue to capitalize on such information as part of their attempts to convince additional third parties (beyond Morgan Stanley) to finance between €70 million and €150 million so that they can acquire more Notes.  That Di Meo effectively has real-time inside information is reflected, for example, in the following statements, which he made during a recorded conversation with the Investigative Firm on August 9, 2021:

So, I spoke to them two days ago, they understand the other hedge funds that own 100 million.  They are speaking to the company, you know that I have a different strategy on this point . . . They're speaking to the company.  They understand now there was a legal action by the state vis-à-vis Moby last week, which basically makes them understand now that the state will want a change of ownership.  *So, they told me that they're formally speaking with the company, but they're not going to rush the negotiation before September because they also understand that the court and the state, in some way, will effectively push out the current shareholder from the governance.* So, they are pretending to negotiate because they have an interest to receive all the information that you can receive only if you speak to the company, but they– again, they are not rushing into any agreement formally.  *And even if they do, they don't have the votes to put the plan through, so it's irrelevant because they need my vote. Because I need to buy them.* That's the only– that's why we are talking, because– . . . *Yes, but they don't have the vote to push through the bondholders meeting because I will block it in the bondholders meeting.*  (Emphasis added.)

82.     Similarly, upon information and belief, Di Meo had no qualms about disclosing sensitive information about the Moby Group and the value of its assets to multiple third parties,

including (i) the Grimaldi Group, Moby's primary competitor; and (ii) prominent Italian political figures, such as those at the Italian Ministry of Economic Development.   As articulated in recorded conversations with the Investigative Firm on May 26, July 29, August 9 and August 16, 2021, Di Meo stated that the Grimaldi Group and the Ministry of Economic Development favor a change in Moby's governance and would give him *carte blanche* to run the Company in the manner of his choosing should Defendants succeed on their scheme.

> The lawyer of Grimaldi has got in touch with me in the past, there have been just exchange of views, let's say, but I've been playing my game, he's playing his game.  (May 26, 2021)

> I explained to you last time, the Ministry of Economic Development is sponsored– owned by the Northern League, and the Northern League has been funded by the main competitor of Moby . . . The leverage is that you can, once you control the situation, your vote can procure the bankruptcy in liquidation or the continuity, that's the leverage. *But more than the leverage is a gift that you bring to the table to the Ministry, which is, I put you in the position to have the largest ferry asset in Italy be operated by normal governance, by . . . without any support, I would say to the– to the Ministry I would say, "Tell me who should run this business, I just put the structure where I make my money and I leave the governance to whoever you dictate should be run this business by."*  So, that's what it is.  This perspective is dangerous.  When people go up the stairs.  (July 29, 2021; emphasis added.)

> Yes. I understand that they [Grimaldi] sponsor financially the Northern League. They are one of the financial sponsors of the Northern League. *That's why Grimaldi hates Onorato, and that's why he wants to see this company managed by another owner.  They know that they cannot take over the company because of anti-competition rules, but he personally hates Onorato, and so, his objective in life is to have Moby taken over by different owner.*  I'm sure they would prefer to have a friendly owner that they can have a better marketplace with better pricing, to make more money, that's what Grimaldi is after . . . In a normal world, they shouldn't bother about Italy, he only has a personal beef with Onorato, which has gone into the public press.  They say things to each other through the newspapers, like, I don't know.  And so, his objective, which is a personal vendetta, is to see Onorato without his company.  (August 9, 2021; emphasis added.)

> *I've spoken to my intermediary who speaks to the Ministry and speaks to Tirrenia administrators, and their only objective is a change of equity, ownership of this company, to put a reliable equity owner in the seat.*  That's what they care.  So if I

can create the situation to achieve these objective for them, they will support it. (August 9, 2021; emphasis added.)

Well, I think that the chances are that there is a conversation before the vote, so the moment there is a competing plan that shows new governance, new shareholding, and before the vote, before the competing plan is put through and creditors vote, and *that's the moment where I plan to go to the real stakeholders, and the real stakeholder is the government*, and first things first, because obviously they will have the view on how this money should be divided between these three companies, and who the stakeholders of the three companies should be . . . *And secondly, to Grimaldi, to the extent that he's willing to engage with the competitors. . . . So, I need to be very careful because I cannot be seen in public that I'm considering teaming up with a competitor of the company I'm investing in just to make– to throw out the current shareholder of Moby.* (August 16, 2021; emphasis added.)

### E. Defendants' Scheme to Harm Other Creditors

83. Defendants' scheme would also impair the rights of other Moby creditors, including other bondholders. This is because the scheme necessarily involves acquiring a blocking position to undo the progress represented by the MOU in an effort to devalue Moby and overall creditor recoveries in favor of Defendants' individual gain.

84. Among other things, Di Meo seeks to convert Defendants' Notes into equity with "governance rights" (meaning, upon information and belief, that with a dominant bondholder stake, he would obtain control over how to manage Moby, including by deciding whom to appoint within management) and, with such authority, minimize recovery to other creditors. In recorded conversations with the Investigative Firm on May 26 and June 3, 2021, Di Meo repeatedly emphasized this objective:

So, basically, *my plan is to use my key voting rights to minimize the recovery of other creditors* and cut the deal with the equity to co-own the equity with him. (May 26, 2021; emphasis added.)

[I]f we can show up with a plan which has your new money and maybe I put some more money myself in, which is, let's say, an equity capital increase in the company *in exchange for the creditors to take a massive write-off. And I will say yes to that massive write-off* because I will be more than compensated in the new

structure, but *through my 'yes', I can force the other creditors to take a massive write-off.* (June 3, 2021; emphasis added)

We try to line up enough bonds to control 50% and then to also get the new equity of the business. We spend some – less money than 70, let's say 40, so we spend 35-40 million for the purchase of the bonds, and we spend, let's say, 40 million in the equity capital increase . . . *So, to create the asymmetry to reduce the creditors' recovery to the maximum we can, so that our equity investment is worth much more in the remaining perimeter, we need to put some fresh equity in the plan.* (June 3, 2021; emphasis added.)

85.     In recorded conversations with the Investigative Firm on August 9 and 16, 2021, Di Meo unequivocally represented his intent to increase Defendants' share of the Notes and to buy just enough to then proceed with his plan – to the clear detriment of other bondholders and the other creditors.  As made express in the statements below, Di Meo is motivated solely by his and co-Defendants' interests and their objective of seizing Moby.

And I can push by myself the plan through the bondholders meeting . . . once you buy the bondholders with 50 million, the mathematics of the bondholders meeting is such that *I don't need to buy anybody else . . . The other guys [bondholders] will never try to defend themselves once they know that I have the votes in the bondholders' meeting to push the plan I want.  They will come and knock on my door asking me to join the group, but I don't need their votes anymore, at that point.*  (August 9, 2021; emphasis added.)

*Ultimately, I want to be in a position where only our vote is enough to pass with the majority the competing plan that I will put forward, and that's why we want to buy certain bonds, to make sure that we can sell, vote such proposal* . . . The proposal will say, "All the creditors, including our bonds, get certain recovery over the next five years, but *because we will make an equity capital increase, we'll take control of the company*."  So, let's say there are various ways of doing it, and we are not at the stage to exactly crafting the way of doing it because we want to wait for the judicial commissioner's report in September, October.  So, but ballpark, all the creditors, 700 million, take 20 cents in a dollar over the life of the plan . . . [T]he company will pay 20 cents in a dollar, *we will sell some ships, or we will get cash flows from the operations in the business.  We will pay 20 cents of the dollar, so let's say 200 million to all the creditors over the next five years, and to do that, to take control of the company, we'll make a capital increase – sorry, really . . . an equity raise, an equity capital increase* . . . And the other thing is that, for example, the risk we're running now is that – I discussed this with you a month ago – I think end of August, or at the latest the beginning of September, is the closing of the window to buy the other bonds because if the

25

bond purchase doesn't happen, of the other bonds, *then the risk I'm running/ we're running is that the deal takes a shape that gets discussed and . . . a few times between the hedge fund and the current shareholder, such that then, it's very difficult for a hedge fund to sell the bonds because the deal is taking a positive shape, the hedge fund is seeing, let's say, 80% recovery in the deal that they are trying to negotiate with the owner and therefore they are gonna say, "Why do I need to sell it 50 cents on a dollar?"* (August 16, 2021; emphasis added.)

86.     Di Meo's determination to take over Moby and potentially dismantle it – despite his own admissions in conversations with the Investigative Firm that the Company is "stable" and "doing much better now" financially – is further reflected in statements made during recorded conversations with the Investigative Firm on July 29 and August 16, 2021. Specifically, Di Meo states that his competing restructuring plan for Moby – should he succeed in being able to secure dominant voting power – is premised upon disposing of important Moby assets (two vessels) in order to make his proposal "more credible" to the Milan Tribunal (i.e., because it would optically demonstrate that his plan calls for an infusion of liquidity). Di Meo then makes clear that his proposal also contemplates selling two additional Moby vessels for a *low price*. The disposal of vessels in such a manner, of course, harms other creditors because it lowers the value of Moby's assets.

> I don't want all my eggs in this basket, personally, so the optimal way for me to do it is ideally with you because then, *you also bring the value of buying the two large ships in the back end and that's value. That's valuable to me because that makes my alternative plan more credible vis-a-vis the court. But if you guys don't show up, I'm collecting the funding through my contacts to buy out that one hedge fund so that it's game over.* (July 29, 2021; emphasis added)

> Because it makes no sense, *now that the situation is stable, the company is doing much better now with COVID coming out, there is a lot of demand for transportation in these vessels, so the situation is stable, it's not gonna go into bankruptcy, now that the court has admitted the company to a proper . . .* So, ideally, if you guys get there on time, happy days because there is the additional value add [added value] which is the buy of the ships, which gives more cash flow in the plan, certainty of cash flows in the plan. I don't need to say, "I hope I will sell those ships for value," I already have bids for these ships at this value, and

26

that's a transaction which would be part of the restructuring . . . . (July 29, 2021; emphasis added)

So, "Dear court, dear creditors, two ships will be already sold for this amount." *Then we sell other two ships at very low valuation, and that's how you recover 20 cents on the dollar. And what's left over is for the equity. So, your purchase of the two ships will be part of the plan,* it will not be something that we first take it over, we sit on the new board and then we decide. No – will be part of the plan, so the moment when we vote, the plan will already say, "*The moment the plan is approved, these two ships are sold for this price, this entity, no matter what.*" So, that's important that you understand. There is no execution risk if we vote in favor of the plan that you don't get the two ships. It will be part of the plan. *And it will be executed the moment the Chapter 11 gets sanctioned by the court, and therefore all the write-offs and swapping to equity happen.* (August 16, 2021; emphasis added.)

## II.    DEFENDANTS' SCHEME IS PART OF A PATTERN OF OBSTRUCTION TO HARM MOBY

### A.    Overview

87.    Defendants' scheme to undermine and harm Moby and ultimately assume control over the Company has long been in the works. Upon information and belief, Defendants have been working closely together to orchestrate this takeover since 2018, at the latest, and their endeavor continues unabated today. Indeed, Morgan Stanley was well familiar with Moby as a company – including its finances and operations – because, through in or around February 2018, it advised Moby on a potential takeover of the Lenders' debts. The takeover did not take place but, in the course of that advisory work, Morgan Stanley received confidential information pertaining to the Company.

88.    In a recorded conversation with the Investigative Firm on August 22, 2021, Drazin – who was in New York at that time – summarized the agreement between Morgan Stanley and Di Meo as follows:

My partner at Morgan Stanley, as Antonello [Di Meo] mentioned, Massimo Piazzi, is also a very close friend of Antonello's . . . *We've been involved in this situation as a passive bondholder, but supportive of Antonello's plans since pre-corona, probably since 2019 maybe even 2018, and we remain, you know,*

27

Case 1:22-cv-01300  Document 1-1  Filed 02/15/22  Page 33 of 57

*committed to that proce*ss.  You know, we're– in this situation, *we are a capital partner behind Antonello's, you know, orchestration of the process*.  And our intent is to remain.  (Emphasis added.)

89.     Di Meo's machinations to usurp control over Moby has manifested in multiple forms – each with the goal of trying to force Moby into financial distress and restructure its debt.  These have included the following:

(a)     In September 2019, by filing the sham Involuntary Petition that sought to force Moby into involuntary bankruptcy as well as obtain an injunction precluding the DFDS Deal from moving forward;

(b)     In October 2019, by successfully derailing the DFDS Deal – which would have netted approximately €75 million in proceeds and allowed Moby to repay approximately €66 million due under the Term Loan to the Lenders – by unlawfully ensuring that Moby could not deliver the vessels by a certain date; and

(c)     Between October 2019 and February 2021, by actively contesting and rejecting multiple proposals from Moby to various investors (including Sound Point) in connection with a proposed restructuring, which delayed Moby's filing of the Full Petition by a number of months.

90.     As exposed by the Investigation, Di Meo orchestrated the filing of the Involuntary Petition and failure of the DFDS Deal, both of which took place within a matter of just two months, directly caused Moby's liquidity crisis, and forced Moby into restructuring proceedings.  The reason that Di Meo was focused on stopping the DFDS Deal was because it would have resulted in proceeds that benefitted the Lenders as opposed to the bondholders (including Sound Point).  Di Meo also intended to force Moby into restructuring by aiming to leverage the size of the bond debt to the detriment of the Lenders.  In a recorded conversation with the Investigative Firm on June 3, 2021, Di Meo stated:

28

Case 1:22-cv-01300   Document 1-1   Filed 02/15/22   Page 34 of 57

. . . DFDS, the Norwegian company that wanted to buy two vessels . . . not for cash, but for exchange of vessels plus cash . . . Was– buying the vessels at good prices, *the problem was that the proceeds from those vessel sales would have gone to the bank, not the bonds. So, it was not in my interest for the company to get cash to keep going and pay down the banks*, and then I would have been left at the end of 2023 with no vessels left and a big credit with the banks having gotten out in the meantime. (Emphasis added.)

So, it was our– so, *we filed insolvency request, the bankruptcy request in September 2019 because also, we wanted this transaction to be stopped so that our position between the bond and the banks would have been equalized* . . . and not only equalized because we have more bonds than bank debts, *we can outvote the banks in the Chapter 11. So, I was stopping the bleeding of the cash, going to the bank side of the bonds* and I was gaining, negotiating, leveraging the Chapter 11 because the bond is bigger than the bank debts. So, that was the double purpose. (Emphasis added.)

91.    After unfounded allegations publicly aired within Europe as a result of the Involuntary Petition and with Moby being deprived of approximately €75 million in net proceeds, the following consequences ensued in the fourth quarter of 2019:  (i) Moby was unable to move forward with its plans to pay down its debt to the Lenders and, for the first time, was unable to timely pay its debt obligations due under the Term Loan and Notes; (ii) Moby endured reputational harm, which resulted in the loss of two main clients and a decrease in passenger traffic, which translated into approximately €16 million in lost revenues; and (iii) suppliers began demanding payment within a shorter period of time or, in some cases, required immediate payment.

92.    Ultimately, as a result of Di Meo's unlawful actions, in June 2020, Moby was forced to file the Preliminary Petition.

93.    Like the arsonist returning to watch the house burn down, Di Meo relishes his role in triggering the liquidity crisis and subsequent filing for restructuring.  In a recorded conversation with the Investigative Firm on June 3, 2021, Di Meo stated:

And I'm a financial investor who's only after money, making money . . . [Vincenzo Onorato, Moby's Chairman] cannot accept the concept that *I put him*

29

*in a corner by filing a bankruptcy request two years ago, which has then determined the liquidity squeeze, the necessity to file for Chapter 11 and so on, in my request to partially govern the company . . . .* (Emphasis added.)

94.    In parallel, from late 2019 to early 2021, Di Meo consistently undertook value-destructive positions that hindered Moby's efforts to restructure its debt or otherwise implement necessary steps to implement any proposed plans to increase profitability. He repeatedly rejected Moby's restructuring proposals, notwithstanding that each successive plan afforded him and other creditors (including other bondholders) substantial benefits. This ultimately led to prolonged delays in Moby filing for the Full Petition with the Milan Tribunal, thereby incurring unnecessary costs and, more importantly, stymying the Company's efforts to restructure its debts and strengthen its financial standing as soon as feasible.

### B. Di Meo's Successful Efforts to Derail the DFDS Deal and Moby's Restructuring Plans

#### 1. Moby's Business Plan for 2019 to 2021

95.    In 2017, the Moby Group had a profitable year, increasing its revenues by 8.6% from 2016. In 2018, however, profitability decreased due to (i) increased competition for the Sardinia and Sicily ferry routes; (ii) expenses associated with Moby's expansion in the Mediterranean and Baltic Seas; and (iii) increased costs, including for fuel and other port-related expenses. The Moby Group's financial stress in 2018 triggered a steep drop in the price of the Notes in the last quarter of 2018. For instance, in or around mid-2019, the Notes were traded at approximately 30% of their nominal value.

96.    In early 2019 and to improve the Moby Group's profitability and reduce its debt, Moby and its Lenders agreed on a business plan that set forth milestones for the period 2019 to 2021 ("Business Plan"). A cornerstone of the Business Plan was the sale of certain non-strategic vessels – namely, vessels that were not mission-critical and whose sale would not have disrupted

Case 1:22-cv-01300 Document 1-1 Filed 02/15/22 Page 36 of 57

Moby's essential business – to pre-pay part of Moby's bank debt ("Fleet Optimization Plan"). In particular, the Fleet Optimization Plan included the prospective sale of two vessels for €72.5 million in Q4 2019 to a still-to-be identified buyer.

97.     Moby, in compliance with the Debt Agreements, planned to use a substantial portion of these anticipated vessel sale proceeds to repay its outstanding debt under the Term Loan – at the time, amounting to approximately €100 million – to the Lenders.

98.     At the Lenders' request, PricewaterhouseCoopers Advisory S.p.A. ("PwC") evaluated the viability of the Business Plan. On March 18, 2019, PwC issued a report – a copy of which was shared with the Lenders – in which it attested to the viability and feasibility of the Business Plan, including the sale of the vessels.

### 2.     The DFDS Deal

99.     In or around mid-2019 and in accordance with the Business Plan, Moby began negotiating with DFDS over the sale of non-strategic vessels. On September 6, 2019, Moby and DFDS executed agreements relating to the deal ("DFDS Deal Agreements"). Specifically, the terms of the DFDS Deal were as follows: (i) Moby agreed to sell two vessels, named "Moby Aki" and "Moby Wonder" ("Moby Vessels"), to DFDS; and (ii) DFDS agreed to sell two vessels, named "King Seaways" and "Princess Seaways" ("DFDS Vessels"), to Moby.

100.     The pricing terms were as follows: Moby agreed to sell the Moby Vessels for the fair market price of approximately €137 million (Moby Aki for €75 million and Moby Wonder for €62 million) and, in return, purchase the DFDS Vessels for the fair market price of €62 million. The DFDS Deal – which was permissible under the Debt Agreements – was an ordinary business transaction and consistent with Moby's prior practice. In recent years, Moby had sold ten vessels and purchased eight.

101.    Moby was required to deliver the Moby Vessels to DFDS free of any encumbrances, including the mortgages that collateralized the Term Loan and Notes, by October 25, 2019 ("October 25 Deadline").  If, by that date, Moby was unable to meet this obligation, DFDS was entitled to damages in case of Moby's negligence and/or could terminate the DFDS Deal.

102.    Moby had the right to proceed with the DFDS Deal. The approximately €75 million in net proceeds that it would have realized would have allowed the Company to (i) restructure its debt by repaying approximately two-thirds of its outstanding Term Loan (approximately €66 million out of the overall €100 million due); and (ii) pursue other legitimate corporate purposes with the remaining €9 million, including bolstering its existing fleet (e.g., by making improvements to the vessels).

103.    In sum, the DFDS Deal would have significantly reduced the balance due on the Term Loan (which was due in its entirety by 2021), decreasing it from €100 million to €34 million.  Furthermore, Moby's remaining two installments for the repayment of the outstanding amount of the Term Loan due by February 2021 would have been reduced to €17 million each.

104.    Unfortunately, Di Meo destroyed Moby's plans to ensure a significant infusion of liquidity by leading an effort to file the Involuntary Petition and, when that scheme failed, by rendering it impossible for Moby to obtain the mortgage release – a key requirement under the DFDS Deal.

### 3.    The Sham Involuntary Petition

105.    In September 2019, Di Meo caused the filing of the Involuntary Petition and accompanying request that the Milan Tribunal issue a temporary restraining order ("TRO") to enjoin the DFDS Deal.

106.    On September 10, 2019 – just four days after Moby executed the DFDS Deal Agreements – Sound Point and Di Meo spearheaded an effort, involving other then-investors (together, "Ad Hoc Group 2"), to file the Involuntary Petition.  In their filing, Ad Hoc Group 2 argued that Moby would not be able to repay the Notes that would be due in approximately three years and eight months from the date of such filing.  Ad Hoc Group 2 lodged this claim even though Moby was *current* on its payments on the Notes as of September 2019.

107.    Less than a week later, on September 16, 2019, Ad Hoc Group 2 – led by Sound Point and Di Meo – filed a TRO arguing that execution of the DFDS Deal would reduce Moby's assets to their detriment.

108.    The Milan Tribunal denied the TRO and rejected the Involuntary Petition.  On September 17, 2019, the Milan Tribunal denied the TRO because, *inter alia*, certain elements for granting the TRO were not met.  And, on October 3, 2019, the Milan Tribunal rejected the Involuntary Petition because Moby was solvent and would not be insolvent in the near term, let alone in February 2023 (over three years in the future) when the principal on the Notes was due.

109.    Furthermore, in its ruling on the Involuntary Petition, the Milan Tribunal noted that Ad Hoc Group 2 did not file the Petition in order to obtain from the Tribunal a ruling that Moby was bankrupt; rather, the Tribunal found that it did so in order to force Moby to restructure debt.  The Milan Tribunal thus ultimately directed Ad Hoc Group 2 to pay Moby's legal costs related to the unwarranted Involuntary Petition.  Ad Hoc Group 2 did not appeal the Milan Tribunal's ruling.

### 4.    The Attack on the DFDS Deal

110.    After efforts to instrumentalize the Milan Tribunal as part of his scheme failed, Di Meo remained undeterred in his effort to derail the DFDS Deal.  Di Meo orchestrated a plan to force the bank designated as the "Security Agent" under the Debt Agreements ("Bank") not to

Case 1:22-cv-01300   Document 1-1   Filed 02/15/22   Page 39 of 57

release the mortgages on the Moby Vessels by the October 25 Deadline – a key requirement to closing the DFDS Deal. As set forth in the Debt Agreements, the duties of the Security Agent include holding and administering any Collateral that secured the Term Loan and Revolving Facility. Further, upon information and belief, Di Meo was involved in efforts to disrupt the DFDS Deal through direct outreach to DFDS.

111.    Ultimately, Moby could not close the DFDS Deal because the mortgages remained on the Moby Vessels after the October 25 Deadline. Moby had otherwise fully complied with its obligations under the Debt Agreements relating to the Moby Vessels. Moby had, for instance, confirmed to the Bank that the sale of the Moby Vessels was a "Permitted Transaction" that satisfied the conditions and complied with the requirements set forth in the Debt Agreements. In particular, in compliance with and as required under the Intercreditor Agreement, Moby certified to the Bank that (i) the sale complied with the terms of the Credit Facilities Agreement and Indenture; (ii) the assets (here, the Moby Vessels) were not required to remain as part of the Collateral under the Credit Facilities Agreement; and (iii) the sale was not taking place in the context of an enforcement of the security or other case of debt acceleration.

112.    On October 29, 2019, DFDS walked away from the DFDS Deal. In so doing, DFDS improperly asserted that Moby's inability to provide encumbrance-free vessels by October 25, 2019 showed that Moby had no intention to complete the DFDS Deal altogether. That surely was not the case as reflected in, among other things, the fact that Moby had invested over €2.2 million to prepare the Moby Vessels for their delivery to DFDS. As a result, DFDS breached the DFDS Deal Agreements – namely, by purporting to terminate them for repudiatory breach when, in fact, it had no right to do so.

Case 1:22-cv-01300  Document 1-1  Filed 02/15/22  Page 40 of 57

113.    Di Meo's second attempt at derailing the DFDS Deal was thus successful.  It had the effect of not only precluding the infusion of approximately €75 million in net proceeds from the transaction, but causing additional damages to Moby (including the prospect of a claim from DFDS).  Moby had intended to use the vast majority of the proceeds to repay the Lenders and significantly reduce the amount due under the Term Loan.

### C.    Triggering of a Liquidity Crisis in Late 2019 and Other Significant Harm

114.    The filing of the sham Involuntary Petition and subsequent failure of the DFDS Deal triggered a severe liquidity crisis for the Moby Group in late 2019.  In particular, deprived of the approximately €75 million in net proceeds that it had anticipated from the DFDS Deal, Moby was ultimately unable to implement the Business Plan.

115.    The failed DFDS Deal also caused Moby to miss payments, for the very first time, on its debt obligations due under the Notes and Credit Facilities Agreement (which required interest and installment payments in February 2020) to both the Lenders and holders of the Notes.  Furthermore, the unfounded Involuntary Petition injured the Moby Group's reputation with its customers, causing more than €16 million in lost revenues and, in turn, a corresponding decrease in its net profits.

116.    Indeed, until the second half of 2019 – before the filing of the Involuntary Petition and derailment of the DFDS Deal – the Moby Group enjoyed an exceptional reputation in the maritime industry.  For instance, in 2016 and 2017, the Moby Group won the "Italian Travel Awards" (a leading tourism award) for the quality of the daily service offered on its ferries. Similarly, in 2018, the German Quality & Finance Institution praised Moby, as it had done four previous times, for offering its customers the best service among ferry carriers.  In January 2019, Moby became a member of the exclusive "Club of Superbrands," which includes companies that have generated significant innovation in their respective business sectors.

117.    Engineering Moby's liquidity crisis formed the first step of Di Meo's scheme,
backed by Piazzi and Drazin, to take over the Company and its assets.  On multiple occasions
across late 2019 and early 2020, Di Meo publicized his desire and intent to trigger an
unnecessary liquidity crisis within Moby as opposed to help it strengthen.  For example, during a
late 2019 meeting in Milan with Francesco Greggio, Moby's Chief Financial Officer, and an
Italian attorney who had offered to mediate between Moby and several investors (including
Sound Point), Di Meo stated that, through the filing of the Involuntary Petition and the derailing
of the DFDS Deal, the investors wanted Moby to suffer a liquidity crisis in order to (i) force
Moby into a situation of financial need; and, in turn, (ii) pressure Moby to restructure the debt as
desired by certain bondholders (led by Di Meo and Sound Point).

### D.    Active Interference in Moby's Restructuring Efforts Between 2019 and 2021

118.    Following the failure of the DFDS Deal, Di Meo continued to hinder Moby's
efforts to restructure its debt or otherwise implement necessary steps to implement its Business
Plan.  Between late 2019 and May 2020, Di Meo dragged Moby into pointless negotiations with
other investors (including Sound Point), with no involvement of the Milan Tribunal, to cajole a
restructuring of the Company according to his terms.

119.    Despite Moby's good-faith effort to reach a restructuring agreement with Di Meo,
the negotiations that took place during this period failed primarily because the proposals that
Di Meo advanced were illegal under Italian law and penalized Moby's other creditors (e.g., the
Lenders) and other stakeholders.

120.    For example, during a May 16, 2020, video conference with Moby representatives,
Di Meo proposed that Moby illegally misuse bank loans – ultimately guaranteed by the Italian
government – that Moby could receive as part of Italy's national emergency plan to mitigate the
negative effects of the COVID-19 pandemic ("May 16 Videoconference").  Di Meo knew that

36

Case 1:22-cv-01300   Document 1-1   Filed 02/15/22   Page 42 of 57

these government-guaranteed bank loans could not be used to pay creditors and could only be used for business operations and ongoing payroll.

121.    During these May 2020 negotiations, Di Meo also threatened forcing Moby into liquidation if Moby would not accept his illegal restructuring proposal. Di Meo repeatedly made demands designed to create duress with the specific intent of extorting control over Moby. In the May 16 Videoconference, Di Meo asserted that he would not care if Moby was declared bankrupt to the detriment of all of Moby's creditors. In his words, Di Meo had invested "four liras" – an Italian expression meaning that the amount invested in Moby was relatively low – and would, in any case, earn back the amount of his investment regardless of Moby's fate.

122.    Even after Moby filed the Preliminary Petition in June 2020, Di Meo unlawfully and intentionally continued to interfere with Moby's restructuring efforts – to the detriment of Moby and the other creditors – by preferring his claims over other classes of creditors.

123.    Di Meo's own words demonstrate that his objective – as was the motivation for filing the sham Involuntary Petition and derailing the DFDS Deal – is to take over Moby. This is because, upon information and belief, some of Moby's creditors were impressed by and reacted favorably to the confidential restructuring proposal (and related business plan) that Moby provided them in December 2020. However, Di Meo rejected it and made clear, at the time, that he would rather see Moby liquidated than accept a restructuring proposal. Even at that time, his goal, of course, was to try to force Moby to give in and turn over control and assets in furtherance of Defendants' scheme.

124.    On February 15, 2021, Di Meo managed to derail another restructuring proposal, which Moby made on January 28, 2021. Moby presented a revised, confidential business plan ("January 2021 Proposal") that would have paid Di Meo and his bondholder group over

37

Case 1:22-cv-01300  Document 1-1  Filed 02/15/22  Page 43 of 57

€150 million – far more than the "four liras" that Di Meo used to purchase his Notes. The value of the January 2021 Proposal to the bondholders was separately confirmed by an independent expert in charge of reviewing the proposal and preparing a report for the Milan Tribunal.

125.    On February 19, 2021, Di Meo made a counterproposal that, within the next three years, required a transfer of assets for €300-340 million "from Moby to Di Meo and the group of bondholders that he led ("February 2021 Counterproposal").

126.    Moby rejected the February 2021 Counterproposal because (i) Di Meo would have obtained an excessive advantage from Moby (i.e., assets for €300-340 million); (ii) the counterproposal was financially unfair to Moby's other creditors (who would have received a fraction of the amount recovered under Moby's January 2021 Proposal) and stakeholders; and (iii) the Counterproposal would not be approved by the Milan Tribunal because Moby could not successfully restructure.

## III.    DEFENDANTS' SCHEME TO SEIZE CONTROL OF MOBY ACCELERATES

127.    In late June 2021, the Milan Tribunal formally opened the *concordato* proceeding and scheduled the December 13 Meeting to approve the Concordato Proposal and Concordato Plan. After that decision, Di Meo intensified his plan to take over Moby – namely, by trying to acquire additional Notes to increase Defendants' collective stake in them and, thereafter, attain a majority voting power among Moby's creditors.

128.    Defendants are on the cusp of succeeding. In a recorded conversation with the Investigative Firm on August 22, 2021, Di Meo articulated his anticipated timeframe for acquiring the majority of the Notes and a dominant voting stake sufficient to derail the Concordato Proposal and Concordato Plan:

> The first part of September is the date . . . And the reason is that *I need the time to ask information to the court in September to make the plan and submit the plan in October. And I can only do that after the bonds are purchased.* So, that's the

reality of it . . . *Obviously I discussed this with Morgan Stanley in the past, and you know that we are going to invest the money ourselves in case you don't want to make the investment. So, again, we, at some point, we will need to pull the trigger because I need the sequencing of events to happen, and the sequencing of events start with purchase of the bonds.* Until we purchase the additional bonds, we cannot ask the confidential information to the court or the company, and then we cannot put together the alternative plan. (Emphasis added.)

129.    Upon information and belief, Defendants have, in recent weeks, begun implementing their plan in accordance with this timetable. On or around September 22, 2021 – just one day after Moby executed the MOU with Ad Hoc Group 1 – Moby learned that a party or parties had been recently trading Notes in the market and that, as a result, the price of Notes had increased. According to the Luxembourg Stock Exchange and as set forth below, the price of the Notes steadily increased from September 6, 2021 through the date of this Complaint.

| Price of Notes Traded on the Luxembourg Stock Exchange | |
| --- | --- |
| **Date** | **% of Nominal Value (Euros)[3]** |
| September 6, 2021 | 34.032% |
| September 13, 2021 | 40.323% |
| September 14, 2021 | 40.188% |
| September 15, 2021 | 40.084% |
| September 16, 2021 | 40.407% |
| September 20, 2021 | 41.167% |
| September 23, 2021 | 43.479% |
| September 24, 2021 | 43.604% |

130.    Upon information and belief, only Defendants have the capacity and motivation to both drive up the price of the Notes and acquire Notes at these higher prices. Defendants are motivated, as demonstrated throughout this Complaint, to acquire a sufficient quantum of the

---

[3]    The price of the Note is measured as a percentage of the Note's nominal value. For example, if the Note's nominal value is €100, then a percentage, or rate, of 34.032% means that the price of the Note is €34.032.

Notes in order to gain control over the restructuring and Moby itself and, in turn, obtain outsized returns on a risk-free investment.

131.    Indeed, Di Meo represents that he can, and has in the past, set prices of the Notes by coordinating bids with Morgan Stanley and by using a broker-dealer with whom he has a longstanding relationship.  In recorded conversations with the Investigative Firm on June 3, 2021, Di Meo summarized this scheme as follows:

> So, the way I would do it is, first, I would need to cut the deal with the hedge funds, which I don't need Morgan Stanley for.  So, once I've cut the deal with the hedge funds, I will say, "You will receive technically the bid from Morgan Stanley" . . . then I need to get the money to Morgan Stanley, it cannot come through you, clearly . . .

> I have a broker dealer that I use, so I usually . . . let's talk about my money, how I do it. I have my broker deal . . . I have a broker dealer in London that has a trading line with my trustee, my bank, and so, from my bank to– the money goes to the broker dealer who is just an agent, so he doesn't own the money in between, but he gives– because he has a trading line with Morgan Stanley, he gives the bid to Morgan Stanley.  Morgan Stanley gives the bid to the hedge funds, and so that's the chain . . .

> *Now, for me to give the order to the broker dealer that then gives the order to Morgan Stanley*, I need to have an escrow with . . . I use a trustee that I trust for many years, who has all my money, so we would need to put the money . . . the trustee is based in Isle of Man, so UK jurisdiction but very flexible, very private, which I like, and I'm sure you guys like . . . So, he would create– and this guy manage billions, so me as a client with few tens of millions, it doesn't move the needle for him. So, that is a guarantee for you, guys.  So, he would set up a client account in Royal Bank of Scotland or Barclays, these are the two banks he works with . . . Or the yeah, these are the two banks he works with.  So, he would set up a client account, the client account is an escrow account, we will write an escrow agreement so that we are, with your lawyers, 100% sure that . . . the money is not going anywhere. So, the money goes– the escrow agreement will say, "I'm transferring this amount of money into this escrow account, client account of this famous trust company that will only be used under the direction of the portfolio manager," which would be me, to– "only for the purpose of purchasing . . . these bonds at a maximum price of X" . . . *So, the trustee then has the money in the client account, then once I give him the direction, give a bid to the broker dealer on these bonds at this price, the broker dealer will give the bid to Morgan Stanley, and Morgan Stanley will buy the bonds from the hedge funds.*  (Emphasis added.)

Case 1:22-cv-01300  Document 1-1  Filed 02/15/22  Page 46 of 57

132.    Furthermore, upon information and belief, there are no financial constraints limiting Defendants' ability to continue unlawfully using confidential, insider information in order to achieve their objective of imminently acquiring a dominant stake in the Notes.  Indeed, Di Meo touts his willingness and ability, with the financial assistance of Morgan Stanley, to pay a premium to achieve his end goal of seizing Moby.  Both Di Meo and Morgan Stanley knew that, even with a potential premium, the price offered to the sellers of Notes did not mirror the higher, real value of the Notes and did not reflect Morgan Stanley's role – namely, that it was providing material assistance to Di Meo in connection with his takeover attempt.  In recorded conversations with the Investigative Firm on June 3, July 29, August 9 and August 16, 2021, Di Meo stated the following:

> That lowers the execution risk of the voting system only if we had in a situation where the court will not declare insolvency but will allow the Chapter 11 proceedings to go through. *I think that is something that we can craft very carefully because you know how hedge funds are, if they smell that there is a buyer, then the price doubles.* (June 3, 2021; emphasis added.)

> To buy €72 million, assuming– obviously we need– I have an– so, *let's say I have an interest for you to spend– for us to spend the least amount of money possible.* (June 3, 2021; emphasis added.)

> But the one thing that it would be anyway very powerful is having at least the bond buying money into some escrow that I can then direct trader at Morgan Stanley to buy . . . it's like– I would need to . . . for the bond buying, it's not that you go to the market and you buy the bonds, you will never get to the levels you need.  I need to go to the three, four other bondholders in a group and saying, "I know you guys are frustrated," I'm gonna take this owner for the next two, three years in legal challenges, I'm gonna scare them out in a way.  *And then I say, "Look, if you want out and I give you some profit on the current mark of the position you have, you're out and I'll take the bonds, and I will keep the fight on my own."* (June 3, 2021; emphasis added.)

> No, the only thing I would speed up if there is interest is potentially the line-up of the bonds because I think the games will be done, at least in terms of– [if] it goes down the Chapter 11, the Concordato route, *then the company will immediately engage with the bondholders. So, again, that is the only thing that– we don't want . . . the other bondholders to go further down the line and then they raise the*

Case 1:22-cv-01300   Document 1-1   Filed 02/15/22   Page 47 of 57

*price* because they see the light at the end of the tunnel. (June 3, 2021; emphasis added.)

The company is worth a lot of money, so it doesn't make any sense to be cheap and not buy out [a bondholder] for 25 to 30 million just because I want to save this 25 to 30 million, when *with this 25 to 30 million you can control half a billion of a company*, so I've come to that conclusion. (July 29, 2021; emphasis added.)

*So, the move, the move to have 100% control is to buy [a bondholder] out. I know it will take 50 to 60 cents on a dollar to buy this [bondholder] out, which means €25 to €30 million.* If your money is coming in, we will do it with your money. *If your money is not coming in, I will put some millions, and Morgan Stanley will put the rest.* (August 9, 2021; emphasis added.)

I discussed this with you a month ago . . . [T]he risk I'm running / we're running is that the deal takes a shape that gets discussed and . . . a few times between the hedge fund and the current shareholder, such that then, *it's very difficult for a hedge fund to sell the bonds because the deal is taking a positive shape*, the hedge fund is seeing, let's say, 80% recovery in the deal that they are trying to negotiate with the owner and therefore they are gonna say, "Why do I need to sell it 50 cents on a dollar?" (August 16, 2021; emphasis added.)

133.   Morgan Stanley has the financial resources and desire to assist Di Meo in successfully buying out the Notes in order to subvert the restructuring. In a recorded conversation with the Investigative Firm on August 22, 2021, Drazin (participating in the call from New York) summarized Morgan Stanley's position as follows:

*We certainly have the capacity to increase our exposure, I think. Right now, relative to our portfolio, this is a small investment. So, we have the capacity to increase that, for sure* . . . I'm actually not sure we're gonna need that much, 23 million bucks is another almost 50 million bonds probably. So, it might get us to the threshold we need anyways, depending on the market conditions at the time. *But we definitely have the capacity to increase the exposure if we need to, in particular, to affect an outcome.* (Emphasis added.)

134.   Defendants are using deceptive, misleading and unlawful methods to effectuate their scheme. <u>First</u>, upon information and belief, Di Meo has been using – and continues to use – confidential, inside information in violation of Market Abuse Laws in order to make decisions on when, from whom and how many Notes he and the co-Defendants must acquire in order to accomplish their takeover scheme.

42

135.    <u>Second</u>, Morgan Stanley – despite holding at least €29 million in Notes (if not more, as of the filing of this Complaint) – has concealed (certainly from other bondholders) that it maintains such a position.  Morgan Stanley even went so far as instructing a notary in London to certify that *Di Meo* controls 26% of the Notes, inclusive of its stake.  This continued concealment is instrumental to taking over Moby because, absent Morgan Stanley and Di Meo pooling their respective shares in the Notes, neither would be anywhere close to amassing majority control among the other creditors in the restructuring.

## CAUSES OF ACTION

### COUNT ONE
### (Tortious Interference with the DFDS Deal Agreements)
### (As Against Defendant Antonello Di Meo)

136.    Moby incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

137.    The DFDS Deal Agreements were valid contracts between Moby and DFDS.

138.    Di Meo knew that the DFDS Deal Agreements existed, were valid and were between Moby and DFDS.

139.    Di Meo intentionally caused DFDS to materially breach the DFDS Deal Agreements and, in any event, rendered Moby's performance of the DFDS Deal Agreements impossible by:

(a)    Filing the Involuntary Petition, which was baseless;

(b)    Filing the TRO, which was also baseless;

(c)    Engaging in efforts to reach out directly to DFDS to disrupt the DFDS Deal; and

(d)    Impeding Moby from ensuring that the Moby Vessels were free of encumbrances by the October 25 Deadline, a condition to closing the

43

DFDS Deal, despite the fact that the Milan Tribunal dismissed both the TRO and the Involuntary Petition.

140.      Di Meo had no justification to take any of these actions that interfered with the DFDS Deal Agreements because:

(a)      Di Meo was not a party to the DFDS Deal Agreements;

(b)      Di Meo had no right to disturb Moby's control over the Moby Vessels and impede Moby from selling the Vessels;

(c)      Moby had the right to pursue the DFDS Deal and its request to release the mortgages complied with the terms of the Debt Agreements;

(d)      Moby had the right to use approximately €66 million of the anticipated proceeds resulting from the DFDS Deal to repay the Term Loan, and the Lenders were entitled to receive such payment from Moby (all pursuant to the Debt Agreements);

(e)      Di Meo did not file the Involuntary Petition in good faith, but rather did so to, among other things, force Moby to restructure debt and cause a liquidity crisis;

(f)      The Milan Tribunal rejected the Involuntary Petition, holding that (i) Moby was solvent; and (ii) the Tribunal could not conclude that Moby would be insolvent in the near future, let alone in February 2023 when the Notes' principal was due;

(g)      Di Meo did not file the TRO in good faith, but rather as a means to improperly block the DFDS Deal and, indeed, the Milan Tribunal rejected the TRO; and

44

Case 1:22-cv-01300  Document 1-1  Filed 02/15/22  Page 50 of 57

(h)     Had the DFDS Deal closed, the Collateral would still fully guarantee the Notes and the loans granted by the Lenders.

141.    Di Meo's improper actions were aimed at harming Moby by:

(a)     Causing the disruption of the DFDS Deal and compromising Moby's relationship with DFDS;

(b)     Causing the disruption of the Business Plan and Fleet Optimization Plan;

(c)     Impugning and tarnishing Moby's reputation, particularly among customers and peers in the ferry and travel industries, by filing the baseless Involuntary Petition and TRO; and

(d)     Triggering a liquidity crisis that subsequently led to Moby's default under the Debt Agreements and filing for restructuring in June 2020.

142.    Di Meo knowingly damaged Moby by interfering with the DFDS Deal Agreements because this caused Moby to lose approximately €75 million in net proceeds that it would have earned from closing the transaction.  Di Meo also (i) caused the disruption of the Business Plan and Fleet Optimization Plan; (ii) exposed Moby to customer losses and claims from DFDS as a consequence of the collapse of the DFDS Deal; and (iii) triggered a liquidity crisis that forced Moby to file for the restructuring in June 2020.

143.    As a result of the foregoing, Moby seeks damages, including punitive damages, in an amount to be proven at trial.

**COUNT TWO**
**(Tortious Interference with Moby's Business Relationship with DFDS)**
**(As Against Defendant Antonello Di Meo)**

144.    Moby incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

145.    Moby and DFDS had a business relationship.

45

146.    Di Meo knew that Moby and DFDS had a business relationship.

147.    Di Meo intentionally interfered with Moby's business relationship with DFDS, including by:

    (a)    Filing the Involuntary Petition, which was baseless;

    (b)    Filing the TRO, which was also baseless;

    (c)    Engaging in efforts to reach out directly to DFDS to disrupt the DFDS Deal; and

    (d)    Impeding Moby from ensuring that the Moby Vessels were free of encumbrances by the October 25 Deadline, a condition to closing the DFDS Deal, despite the fact that the Milan Tribunal dismissed both the TRO and the Involuntary Petition.

148.    The business relationship between Moby and DFDS was injured as a result of Di Meo's conduct because DFDS terminated the DFDS Deal.  DFDS also subsequently alleged that Moby had caused damages totaling approximately €31.2 million by not meeting the October 25 Deadline and, in turn, closing the transaction.

149.    Di Meo had no justification to take any of these actions that interfered with Moby's business relationship with DFDS because:

    (a)    Di Meo was not a party to the DFDS Deal Agreements;

    (b)    Di Meo had no right to disturb Moby's control over the Moby Vessels and impede Moby from selling the Vessels;

    (c)    Moby had the right to pursue the DFDS Deal and its request to release the mortgages complied with the terms of the Debt Agreements;

(d)     Moby had the right to use approximately €66 million of the anticipated proceeds resulting from the DFDS Deal to repay the Term Loan, and the Lenders were entitled to receive such payment from Moby (all pursuant to the Debt Agreements);

(e)     Di Meo did not file the Involuntary Petition in good faith, but rather did so to, among other things, force Moby to restructure debt and cause a liquidity crisis;

(f)     The Milan Tribunal rejected the Involuntary Petition, holding that (i) Moby was solvent; and (ii) the Tribunal could not conclude that Moby would be insolvent in the near future, let alone in February 2023 when the Notes' principal was due;

(g)     Di Meo did not file the TRO in good faith, but rather as a means to improperly block the DFDS Deal and, indeed, the Milan Tribunal rejected the TRO; and

(h)     Had the DFDS Deal closed, the Collateral would still fully guarantee the Notes and the loans granted by the Lenders.

150.    Di Meo's improper actions were aimed at harming Moby by:

(a)     Causing the disruption of the DFDS Deal and compromising Moby's relationship with DFDS;

(b)     Causing the disruption of the Business Plan and Fleet Optimization Plan;

(c)     Impugning and tarnishing Moby's reputation, particularly among customers and peers in the ferry and travel industries, by filing the baseless Involuntary Petition and TRO; and

47

(d)     Triggering a liquidity crisis that subsequently led to Moby's default under the Debt Agreements and filing for restructuring in June 2020.

151.    Di Meo knowingly damaged Moby by interfering with the DFDS Deal because this caused Moby to lose approximately €75 million in net proceeds that it would have earned upon closing the transaction.  Di Meo also (i) caused the disruption of the Business Plan and Fleet Optimization Plan; (ii) exposed Moby to customer losses and claims from DFDS as a consequence of the collapse of the DFDS Deal; and (iii) triggered a liquidity crisis that forced Moby to file for the restructuring in June 2020.

152.    As a result of the foregoing, Moby seeks damages, including punitive damages, in an amount to be proven at trial.

## COUNT THREE
### (Tortious Interference with Moby's Business Relationships with Creditors)
### (As Against Antonello Di Meo)

153.    Moby incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

154.    Moby has business relationships with multiple creditors, including the Lenders and former and current holders of Notes (together, "Creditors").

155.    Di Meo knows that Moby and the Creditors had and have ongoing business relationships.

156.    Di Meo intentionally interfered with Moby's business relationships with the Creditors – and is continuing to interfere with such business relationships – through wrongful and illegal means and for the sole purpose of harming Plaintiff.  Di Meo's interference included:

(a)     Repeatedly and unjustifiably prolonging the restructuring process from late 2019 to early 2021, thereby resulting in significant delays in Moby being able to file the Full Petition with the Milan Tribunal and, in turn,

48

harming Creditors' interests and their relationship with Moby, and increasing restructuring costs for Moby;

(b) Repeatedly thwarting ongoing delicate negotiations between Moby and the Creditors, including hard-fought understandings as to the restructuring;

(c) Using confidential information relating to Moby and its restructuring, in violation of Italian and EU laws as well as the Sound Point and Di Meo NDAs, to acquire Notes, with the objective of disrupting the *concordato* proceeding, vetoing the Concordato Proposal and Concordato Plan, and potentially seeking to liquidate Moby; and

(d) Undermining an orderly restructuring process to the detriment of Moby and its Creditors, including by seeking to (i) buy out other Creditors' Notes using unlawful means in order to attain a majority creditor stake; (ii) assume control over Moby; (iii) veto the Concordato Proposal and Concordato Plan, thereby potentially forcing a liquidation that would allow Defendants to acquire valuable assets at lower costs (harming the Creditors) and otherwise disfavor the Creditors; and (iv) undermine the DFDS Deal with the specific purpose of depriving Lenders from repayment of Moby's debt.

157. Di Meo's improper actions were aimed – and continue to aim – at harming Moby and its business relationships with the Creditors, including by (i) delaying the restructuring process from in or around October 2019 to February 2021 and therefore increasing Moby's restructuring costs; (ii) deliberately crippling the restructuring, including by seeking to buy out Notes from Creditors at a premium and based upon the unlawful use of confidential information;

49

Case 1:22-cv-01300   Document 1-1   Filed 02/15/22   Page 55 of 57

(iii) seeking to unilaterally veto Moby's Concordato Proposal and Concordato Plan (overruling Creditors) and either impose a restructuring proposal of his choosing or, in the alternative, seek that the Milan Tribunal place Moby into liquidation; and (iv) disrupting the restructuring and thwarting the hard-fought understandings that Moby has carefully negotiated with the Creditors and memorialized in the MOU.

**COUNT FOUR**
**(Tortious Interference and Conspiracy to Tortiously**
**Interfere with Moby's Business Relationships with Creditors)**
**(As Against All Defendants)**

158.    Moby incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

159.    Moby has business relationships with the Creditors.  Specifically, Moby had a business relationship with other holders of Bonds and the Lenders.

160.    Defendants know that Moby and the Creditors had and have ongoing business relationships.

161.    Defendants intentionally interfered, or conspired to interfere, with Moby's business relationships with the Creditors – and are continuing to interfere with such business relationships – through wrongful and illegal means and for the sole purpose of harming Plaintiff. Defendants' interference included:

(a)    Using confidential information relating to Moby and its restructuring, in violation of Italian and EU laws, as well as the Sound Point and Di Meo NDAs, to acquire Notes, with the objective of voting against Moby's restructuring proposal, including the restructuring proposal subject to a MOU with Ad Hoc Group 1, disrupting the *concordato* and potentially seeking to liquidate Moby; and

50

(b)     Undermining an orderly restructuring process to the detriment of Moby and its Creditors, including by seeking to (i) buy out other Creditors' Notes using unlawful means in order to attain a majority creditor stake; (ii) assume control over Moby; (iii) veto the Concordato Proposal and Concordato Plan, thereby potentially forcing a liquidation that would allow Defendants to acquire valuable assets at lower costs (harming the Creditors) and otherwise disfavor the Creditors; and (iv) undermine the DFDS Deal with the specific purpose of depriving Lenders from repayment of Moby's debt.

162.    Defendants' improper actions were aimed – and continue to aim – at harming Moby and its business relationships with the Creditors, including by (i) deliberately crippling the restructuring, including by seeking to buy out Notes from Creditors at a premium and based upon the unlawful use of confidential information, and therefore increasing Moby's restructuring costs; (ii) seeking to unilaterally veto Moby's Concordato Proposal and Concordato Plan (overruling Creditors) and either impose a restructuring proposal of Defendants' choosing or, in the alternative, seek that the Milan Tribunal place Moby into liquidation; and (iii) disrupting the restructuring and thwarting the hard-fought understandings that Moby has carefully negotiated with the Creditors and memorialized in the MOU.

<u>**DEMAND FOR RELIEF**</u>

WHEREFORE, for the reasons set forth above, Plaintiff Moby respectfully requests the following relief:

(a)     Awarding damages to Moby, including punitive damages, in an amount to be determined at trial;

51

Case 1:22-cv-01300   Document 1-1   Filed 02/15/22   Page 57 of 57

(b)    An order awarding Moby its costs and attorney's fees; and

(c)    Any and all other such relief as the Court may deem appropriate.

Moby reserves the right to seek all remedies available at law and equity.

### JURY TRIAL DEMAND

Plaintiff demands trial by jury on issues so triable.

Dated:    October 14, 2021            **QUINN EMANUEL URQUHART & SULLIVAN, LLP**

                                      /s/ Alain Jaquet
                                      _____

                                      Juan P. Morillo (*pro hac vice application forthcoming*)
                                      Alain Jaquet
                                      1300 I Street, NW, Suite 900
                                      Washington, D.C. 20005
                                      Telephone: (202) 538-8000
                                      Email:  juanmorillo@quinnemanuel.com
                                      Email:  alainjaquet@quinnemanuel.com

                                      *Attorneys for Moby S.p.A.*

52